IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 11-01364-TUC-JGZ (HCE) |
| Plaintiff, | **REPORT & RECOMMENDATION** |
| vs. | |
| Stanley Nelson, Jr., | |
| Defendant. | |

Presently pending before the Court is Defendant's Motion To Suppress Evidence (Doc.23). The Government filed a Response To Defendant's Motion To Suppress (Doc. 31). Defendant's Motion came on for hearing on November 9, 2011. Border Patrol Agent (hereinafter "BPA") Eric Blackburn (hereinafter "BPA Blackburn at p. _") testified on behalf of the Government. Transcript of the November 9, 2011 evidentiary hearing, ordered by the Magistrate Judge and filed on November 16, 2011 (TR. 38), is forwarded to the District Court for review. Admitted into evidence were: (1) Government Exhibit (hereinafter "Gov. Exh. _") 1: Photo of Papago Farms Forward Operating Base on March 14, 2011; (2) Gov. Exh. 2: Photo of Dodge truck gas tank on March 14, 2011; (3) Gov. Exh. 3: Photo of Dodge

truck gas tank on March 14, 2011; (4) Gov. Exh. 4: Photo of BPA Supervisor (fnu) Vega (hereinafter "BPA Vega") Dodge truck gas tank search on March 14, 2011; (5) Gov. Exh. 5: Photo of BPA Vega Dodge truck gas tank search on March 14, 2011; (6) Gov. Exh. 6: Photo of Dodge truck gas tank search on March 14, 2011; (7) Gov. Exh. 7: Photo of rear-left Dodge truck on March 14, 2011; (8) Gov. Exh. 8: Photo of Dodge truck cabin interior on March 14, 2011; (9) Gov. Exh. 9: Photo of Defendant's driver's license and tribal identification card, and passenger's driver's license and tribal identification card; (10) Gov. Exh. 10: Photo of Dodge truck and marijuana packages on March 14, 2011; (11) Gov. Exh. 11: Photo of Dodge truck and marijuana packages on March 14, 2011; (12) Gov. Exh. 12: Border Patrol sector map of Papago Farms gate; and (13) Gov. Exh. 13: 8 March 14, 2011 radio dispatch recordings on compact disc. After consideration of Defendant's Motion, the Government's Response, testimony, exhibits, and argument of respective counsel, the Magistrate Judge recommends that the District Court deny Defendant's Motion To Suppress Evidence (Doc. 23).

## I. PROCEDURAL AND FACTUAL BACKGROUND

### A. Indictment

Defendant is charged with having, on or about March 14, 2011, at or near Pisinemo, on the Tohono O'odham Indian Nation, in the District of Arizona, knowingly and intentionally possessed with the intent to distribute approximately 42 kilograms of marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(D).

### B. Facts

From February 2011 to May 2011, BPA Blackburn was detailed to the Casa Grande Border Patrol station where he was assigned to conduct line watch duties.[1] (Blackburn at pp. 5-6). On March 14, 2011, BPA Blackburn was stationed at the Papago Farms Forward Operating Base (hereinafter "Papago Farms FOB") located on the Tohono O'odham Indian

---

[1] BPA Blackburn's definition of "line watch duties" is: to prevent terrorists, terrorists weapons, and smuggled aliens and contraband from entering into the United States. (BPA Blackburn at pp. 5-6).

1 Nation, State Highway 21, three miles north of the United States-Mexico international
2 boundary (hereinafter "border"). (*Id.* at pp. 6, 12, 27). South of the Papago Farms FOB and
3 on the border, is located the Papago Farms gate. (*Id.* at p. 7). There is a camera trained at the
4 gate. (*Id.*). Members of the Tohono O'odham Indian Nation were previously permitted to
5 access the gate to travel through the border, but on March 14, 2011, this was not the case. (*Id.*
6 at pp. 8, 36-37). The gate is shut but unlocked[2] and there is no sign indicating that entry is
7 not permitted or, if entry is made, inspection of vehicles will occur at the gate. (*Id.* at p. 37).

On March 14, 2011, at approximately 6:30 a.m., BPA Blackburn was in a Ford F-250 fully marked Border Patrol vehicle, east of the Papago Farms gate, when he saw a black Dodge pickup truck (hereinafter "truck") south of the gate. (*Id.* at p. 8). Also seen were a male, later identified as Defendant, and a female at the open gate, attempting to enter the United States. (*Id.* at pp.8-9). Defendant informed BPA Blackburn that he was planning to drive north through the Papago Farms gate. (*Id.* at p. 41). BPA Blackburn, who was approximately 50 feet north of the border and the two individuals, advised them that they were not to enter the United States through the gate at any time. (*Id.* at pp. 9, 40). BPA Blackburn pointed east and advised that entry into the United States was at the San Miguel gate.[3] (*Id.*). The two individuals indicated they understood, closed the gate, got into the truck and drove south. (*Id.* at pp. 9, 40-41).

At this time BPA Blackburn did not determine Defendant's tribal status. (*Id.* at p. 9). BPA Blackburn had been instructed that only Tohono O'odham tribe members possessing

---

[2]It is unclear to the Court why the Papago Farms gate is maintained unlocked if no one, including the Tohono O'odham Indian Nation, is permitted ingress and egress through this gate.

[3]The San Miguel gate is 96 miles from the Papago Farms FOB by driving north on paved State Highway 21, east on paved State Highway 86, and south on paved State Highway 19. (Blackburn at pp. 11-12). This route takes approximately two hours. (*Id.* at p. 12). The route parallel to the international boundary also takes two hours to travel. (*Id.*). In either case, it is a four hour round trip. (*Id.*). Speed of travel on the paved road varies while the route on the north and parallel to the international boundary is on dirt trails and washes, thus equating to two hours in either instance. (Blackburn at pp. 43-44).

- 3 -

1 Tohono O'odham tribal identification are allowed to make entry into the United States
2 through the San Miguel gate. (*Id.* at pp. 72, 79). BPA Blackburn could not exclude the
3 possibility that Defendant was a member of the Tohono O'odham Indian Nation and agrees
4 that he looked Native American. (*Id.* at p. 39). Defendant's demeanor did not suggest any
5 nervousness on his part during this contact with BPA Blackburn. (*Id.* at pp. 41-42).

BPA Blackburn continued his line duties and returned to the Papago Farms FOB sometime between 8:30 a.m. and 9:00 a.m. (*Id.* at p. 10). At approximately 9:15 a.m., BPA Blackburn observed Defendant driving the truck north past the Papago Farms FOB. (*Id.* at pp. 10, 12, 40, 45). BPA Blackburn ran to his Border Patrol truck and pursued the truck. (*Id.* at pp. 10, 12, 45-46). BPA Philip Yescas, in another Border Patrol vehicle, followed BPA Blackburn. (*Id.* at p. 10). While in pursuit of the truck, BPA Blackburn did not notice any suspicious driving behavior by Defendant. (*Id.* at pp. 47-48). BPA Blackburn stopped the truck approximately two miles north of the Papago Farms FOB. (*Id.* at p. 46). BPA Blackburn ran the license plates through the Tucson Sector radio. (*Id.* at p. 13). After leaving his vehicle, BPA Blackburn approached the driver's window and confirmed that the driver, *i.e.* Defendant, was the same person he had previously encountered at the Papago Farms gate. (*Id.* at pp. 13). Defendant's passenger was the same woman BPA Blackburn had seen with Defendant earlier at the Papago Farms gate. (*Id.*).

Upon this second contact with BPA Blackburn, Defendant did not indicate nervousness or evasiveness. (*Id.* at pp. 49-50). BPA Blackburn asked Defendant whether he remembered what BPA Blackburn had told him about coming through the Papago Farms gate, and Defendant stated[4] he understood. (*Id.* at pp. 13-14). BPA Blackburn is of the opinion that it was impossible for Defendant to have driven east parallel on the south side of the border to the San Miguel gate, then back west parallel on the north side of the border from the San Miguel gate in the time elapsed (2 hours 45 minutes) from when he first saw

---

[4] BPA Blackburn later testified that Defendant indicated by *eye contact* that "he knew he'd done something he shouldn't have done[]" when asked whether he had understood what he had been told about not utilizing the Papago Farms gate. (Blackburn at p. 16).

- 4 -

1 Defendant to when Defendant later drove past the Papago Farms FOB.[5] (*Id.* at p. 16).

2 Defendant was asked if the truck belonged to him, to which he responded that it
3 belonged to "Manny" but could not remember Manny's last name, which BPA Blackburn
4 considered suspicious. (*Id.* at pp. 14, 51-52). Defendant also stated that the truck was never
5 out of his possession during that weekend.[6] (*Id.* at p. 54). Defendant was asked for
6 identification and Defendant gave BPA Blackburn his driver's license and a Gila River
7 Indian Tribal card. (*Id.* at p.14; *see* Gov. Exh. 9). It was at this time that BPA Blackburn
8 determined that Defendant was not a member of the Tohono O'odham Indian Nation. (*Id.* at
9 p. 77). BPA Blackburn asked Defendant where had he been, and Defendant responded that
10 he had been in Mexico visiting family. (*Id.* at p. 15).

11 BPA Blackburn asked Defendant to get out of the truck and overheard BPA Yescas
12 ask the passenger for consent to look in the truck. (*Id.* at pp. 15-16). BPAs Blackburn, and
13 Yescas, looked throughout the cab of the truck in gaps known by him to exist in Dodge
14 trucks where drugs might be hidden. (*Id.* at p. 17). Also examined was the gas fill area which
15 revealed one loose and one missing screw, indicating that either the gas tank had been
16 dropped from the vehicle or that the bed of the truck had been removed. (*Id.* at p. 17). BPA
17 Blackburn testified that "a gas tank is a good place to smuggle drugs...." (*Id.* at pp. 17-18).
18 Once the condition of the gas fill area was observed, BPA Supervisor Vega[7] got underneath
19 the truck and noticed that the bolts attaching the bed of the truck to the frame were scratched,
20 had been "tooled", with paint removed, indicating that the bed had been taken off the truck.
21 (*Id.* at p. 18). The condition of the screws at the gas fill area and bolts under the bed of the

---

[5] BPA Blackburn was not told by Defendant that he had crossed through the Papago Farms gate. (Blackburn at p. 55).

[6] BPA Blackburn did not explain to Defendant what "out of his possession" meant and assumed that Defendant understood his question, but concedes that Defendant was not asked if it meant that it was out of his sight at any time. (Blackburn at p. 54).

[7] BPA Supervisor Vega was also present during the stop at the roadway. (*See* Blackburn at pp. 30, 58-59).

truck indicated access to the top of the gas tank. (*Id.*). BPA Blackburn also noticed the condition of the bolts underneath the bed of the truck. (*Id.* at p. 58). There was no odor of marijuana at this time. (*Id.* at p. 56).

Defendant and his passenger were detained and the truck was returned to the Papago Farms FOB. (*Id.* at p. 19). Once there, the bed of the truck was tilted to gain access to the gas tank. (*Id.* at p. 22; *see* Gov. Exh. 4). BPA Supervisor Vega spun the "sending" unit[8] and removed it from the gas tank. (*Id.* at pp. 23, 30; *see* Gov. Exh. 4, 5). Packages of marijuana were discovered in and removed from the gas tank of the truck. (*Id.* at pp. 23-24; *see* Gov. Exh. 5, 6, 7, 10, 11). Approximately an hour elapsed from when Defendant was stopped to when marijuana was discovered in the gas tank of the truck. (*Id.* at p. 69).

## II. ANALYSIS

Searches at or near the international boundary of inbound and outbound persons are conducted "pursuant to the long-standing right of the sovereign to protect itself," and generally does not require a warrant nor individualized suspicion. *United States v. Ramsey*, 431 U.S. 606, 616 (1977); *see also United States v. Sutter*, 340 F.3d 1022, 1025 (9th Cir.), *amended,* 348 F.3d 789 (9th Cir. 2003). A border search may be conducted at the "functional equivalent" of a border or at an "extended" border. *United States v. Cardona*, 769 F.2d 625, 628 (9th Cir. 1985); *see also Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973).

"Extended border searches, which 'occur after the actual entry has been effected and intrude more on an individual's normal expectation of privacy[,]...must be justified by "reasonable suspicion" that the subject of the search was involved in criminal activity.'" *United States v. Guzman-Padilla,* 573 F.3d 865, 877-78 (9th Cir. 2009) (*quoting United States v. Alfonso,* 759 F.2d 728, 734 (9th Cir. 1985)). Additionally, law enforcement must have "reasonable certainty" that the international boundary has been crossed by the suspect vehicle or by contraband suspected to be within the vehicle. *Id*. at 878; *United States v.*

---

[8]The sending unit indicates how much gas there is in the gas tank. (Blackburn at p. 23).

- 6 -

*Sahanaja*, 430 F.3d 1049, 1053-54 (9th Cir. 2005). The Papago Farms FOB is three miles north of the international boundary. A dirt road runs through the Papago Farms gate. The Papago Farms FOB is not designed nor designated as an inspection station, such as that at the San Miguel gate. For the foregoing reasons, these facts do not alter the analysis of warrantless searches without probable cause under the Fourth Amendment's extended border search doctrine.

### A. Reasonable Certainty

The "'totality of the surrounding circumstances, including the time and distance elapsed [from the border] as well as the manner and extent of surveillance...'" must be examined in assessing the reasonable certainty of a recent border crossing. *Guzman-Padilla,* 573 F.3d at 879 (*quoting Alexander v. United States*, 362 F.2d 379, 382 (9th Cir. 1966)). A law enforcement officer need not have actually observed the suspect vehicle crossing the border. *United States v. Bennett*, 363 F.3d 947, 950 (9th Cir. 2004).

The standard for reasonable certainty is higher than that required for probable cause, but does not require proof beyond a reasonable doubt. *Guzman-Padilla,* 573 F.3d at 880 (citation omitted). To establish reasonable certainty of a border crossing, "'the totality of the facts and circumstances within the officers' knowledge and of which they have *reasonably trustworthy information* [must] be sufficient in *the light of their experience* to warrant a firm belief that a border crossing has occurred.'" *Id.* (*quoting United States v. Tilton*, 534 F.2d 1363, 1366-67 (9th Cir. 1976))(emphasis in original).

Herein, there are several factors present in support of BPA Blackburn's "reasonable certainty"of a recent border crossing by Defendant: (1) initial contact with Defendant and observance of the truck in Mexico at the Papago Farms gate; (2) Defendant's attempted opening of the Papago Farms gate to enter into the United States; (3) an order to Defendant that entry into the United States at the Papago Farms gate is not permitted; (4) a directive to Defendant that entry into the United States can be made at the San Miguel gate east of the Papago Farms gate; (5) BPA Blackburn's experience and knowledge that it is a four-hour drive from the Papago Farms gate to the San Miguel gate and back on either side of the

border; and (6) the shorter two hour forty-five minute elapsed time to when BPA Blackburn next saw Defendant at the Papago Farms FOB. This totality of facts and circumstances within BPA Blackburn's knowledge is sufficient in light of his experience, warranting a firm belief that Defendant had recently crossed the border at the Papago Farms gate and any contraband found in the truck could confidently be considered to have been brought across the border in the vehicle.

### B.    Reasonable Suspicion

Reasonable suspicion of criminal activity is not governed by any specific set of factors. *United States v. Franco-Munoz*, 952 F.2d 1055, 1058 (9th Cir. 1991)( circumstances sufficient to "paint a picture that would create in the mind of a trained border patrol agent a reasonable suspicion that the [vehicle's occupants were] engaged in criminal activity."), *overruled in part on other grounds by United States v. Montero-Camargo,* 208 F.3d 1122 (9th Cir. 2000). The evidence supports the conclusion that BPA Blackburn had reasonable suspicion of drug or alien smuggling: (1) Defendant was seen by BPA Blackburn driving the same truck as before, through the Papago Farms FOB, located three miles north of the international border; (2) the physical impossibility that Defendant drove from the Papago Farms gate to the San Miguel gate, and back in a relatively short time; (3) the "reasonable certainty" that Defendant had recently crossed into the United States through the Papago Farms gate, as discussed *supra*, at II.A.; and (4) the reasonable conclusion that Defendant ignored BPA Blackburn's admonishment that entry was not permitted through the Papago Farms gate.

After Defendant drove the truck through the Papago Farms FOB, BPA Blackburn pursued Defendant and stopped him two miles further north. The subsequent search of the truck was consistent with extended border searches which "are typically separated from the border by 'a greater spatial and temporal distance' from the actual border ...." *United States v. Abbouchi*, 502 F.3d 850, 855 (9th Cir. 2007). BPA Blackburn had reasonable suspicion that any contraband in the truck was there when it entered the United States and that a search would uncover such, as evidenced by: (1) Defendant's disregard for BPA Blackburn's

admonishment not to enter through the Papago Farms gate; (2) Defendant's recent unauthorized entry into the United States; (3) Defendant's production of tribal identification (Gila River Indian Reservation) that would not have permitted entry at the San Miguel gate; (4) Defendant's inability to provide a last name for the person who leant him the vehicle; (5) the fact that one loose and one missing screw were observed on the truck's gas fill, indicating that the gas tank may have been removed to place drugs therein; and (6) the observation of bolts, that secure the bed to the truck frame, which were scratched, "tooled" and missing paint, indicating that the bed had been lifted to allow access to the gas tank. Border Patrol agents were then given consent[9] to further search the truck.

The truck was then taken to the Papago Farms FOB, where drugs were found secreted in the gas tank once the bed was titled to allow access to the gas tank.

### III. CONCLUSION

BPA Blackburn had both reasonable certainty that Defendant had recently crossed the border from the Republic of Mexico into the United States through the Papago Farms gate and reasonable suspicion to believe that the truck driven by Defendant to enter the United States contained contraband. *See, e.g., Guzman-Padilla*, 573 F.3d 865. Consequently, the stop and search of the truck driven by Defendant was justified under the extended border search doctrine.

### IV. RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court deny Defendant's Motion To Suppress Evidence (Doc. 23).

Pursuant to 28 U.S.C. §636(b), Rule 59 of the Federal Rules of Criminal Procedure, LRCrim 12.1 and LRCiv 7.2(e), any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number: **CR 11-1364-TUC-**

---

[9]Defendant did not testify regarding consent or the involuntariness of consent given. Testimony elicited during cross-examination of BPA Blackburn does not indicate that BPA agents overreached or were overbearing. (Blackburn at pp. 61-64).

**JGZ**.

Failure to file objections in accordance with Fed.R.Crim.P. 59 will result in waiver of the right to review.

DATED this 2nd day of December, 2011.

_____
Héctor C. Estrada
United States Magistrate Judge